**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No. CR-21-197-JFH |
| | ) |
| THOMAS RAYMOND PHILLIPS, III, | ) |
| | ) |
| Defendant. | ) |

## FINDINGS AND RECOMMENDATION

This matter comes before the Court on Defendant's Motion to Suppress Defendant's Statements (Docket Entry #59). United States District Judge John F. Heil, III, who presides over this case, referred the subject Motion to the undersigned for Findings and Recommendation pursuant to 28 U.S.C. §636(b)(1). On November 1, 2022, this Court conducted a hearing on the Motion. Cameron McEwen and Jarrod Leaman appeared on behalf of the Government. Warren Gotcher appeared on behalf of Defendant Thomas Raymond Phillips, III, ("Defendant"), who was personally present.

Defendant's original motion seeks to suppress any statements he made on December 20, 2020, while en route to the University of Oklahoma's Medical Center located in Oklahoma City, Oklahoma, and statements that were made on December 22, 2020, while at the medical center. But at the hearing on November 1, 2022, the parties agreed that the only statements at issue were those made by Defendant on December 22, 2020, during his interview with Agent Miles Keene and Special Agent Adam Whitney. Therefore, these

1

Findings and Recommendation will only address those statements.

## Background

On the night of December 19, 2020, the Choctaw County Sheriff's Office received a call alleging that shots had been fired at Tommy's Bar, which is located at 3736 U.S. Highway in Fort Townson, Oklahoma. When the officers arrived, they located BJ Youngblood inside the bar. He was deceased with an apparent gunshot wound to the head. Witnesses informed the officers that Defendant was responsible for the shooting and that he had fled the scene.

On December 20, 2020, at approximately 2:50 a.m., Choctaw County deputies observed a vehicle matching the description of Defendant's traveling westbound on U.S. Highway 70 in front of Tommy's bar. As officers attempted to catch up with the vehicle, it left the roadway and crashed into a large tree. Defendant was found inside, and he had suffered severe injuries. He was then medi-flighted to the University of Oklahoma's Medical Center for treatment.

On December 22, 2022, Oklahoma State Bureau of Investigation ("OSBI") Agent Miles Keene and Special Agent Adam Whitney were called to the University of Oklahoma's Health Science Center to interview Defendant. They began interviewing Defendant at 11:35 a.m. and the interview ended at 12:45 p.m. *See* Defendant's Exhibit

No. 6. The interview was audio recorded.[1] Agent Keene introduced himself and Special Agent Whitney as they entered the room and informed Defendant that they were with the OSBI. Agent Keene explained that the Agents were there to discuss the incident that allegedly occurred on December 19, 2020, and he informed Defendant of his rights. The exchange between Agent Keene and Defendant is as follows:

> Keene: Well, we were just going to talk to you a little bit about that, if that is okay with you. But uh one of the things I like to do with people is. . . is just start off with just kind of reading those rights to you. You are in kind of a situation you can't really get up and leave or anything like that, but if you get tired of us being in here in the room you just let us know, okay? We've got other things to do, but we would much rather be here visiting with you.
>
> Defendant: I understand my rights.
>
> Keene: Okay well I'll just go ahead and read them to you just so that we're clear on it, okay? And this is just the same kind of stuff that you've probably heard before on the tv and stuff. But it says you have the right to remain silent. Anything you say may be used against you in court. You have the right to talk to a lawyer before we ask you any questions, and to have him or her present with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer any questions now, without a lawyer present, you have the right to stop answering questions at any time. So just like I told you, if you get tired of us being in here then you let us know. Typically, that doesn't happen . . . [inaudible]. . .I understand you're not feeling well. Those are your rights and then there's a waiver here. I'll go ahead and read that to you as well. It says. . .

---

[1] The recording of the entire interview is contained in the Government's Exhibit No. 2, which was admitted at the hearing. The recitation of the known facts stems from the testimony of Agent Keene and Special Agent Whitney, as well as the Court's review of the audio recording of the interview.

At that point during the interview a nurse interrupted the conversation. Agent Keene asked if she needed Defendant or if he was in the way. The nurse told him no. After she left Agent Keene continued:

> Agent Keene: It says I've read this statement of my rights and I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercions of any kind has been used against me. That all make sense to you? Do you know what kind of medication they got you on today?
>
> Defendant: Umm. . . Oxycodone, Morphine. . .[2]
>
> Agent Keene: What? They've got you a list there? But you're aware of what is going on today and who we are and all that? Okay, if you agree with those would you mind signing it and then we can just talk to you, like I said you can stop at any time. Here you go sir.

Agent Keene testified that after the above exchange with Defendant, he handed Defendant the Waiver of Rights. *See* Government's Exhibit No. 1. Agent Keene told Defendant that he could read the Waiver of Rights. Defendant then asked if the waiver was an admission of guilt. Agent Keene told him that it was not and then reexplained that the waiver said that Defendant understood his rights but was still willing to talk to the agents. Defendant then signed the Waiver of Rights. *See* Government's Exhibit No. 1. Agent Keene

---

[2] Defendant took 1,000mg of methocarbamol at 6:08 a.m. and 5mg of oxycodone at 3:08 a.m. 4mg of morphine was administered through his IV at 6:50 a.m. and 10:29 a.m. *See* Defendant's Exhibit No. 3.

4

testified that he printed Defendant's name for him because Defendant was unable to easily do so.

After Defendant signed the waiver, Agent Keene questioned him on a variety of topics surrounding the events of December 19, 2020. Later in the interview Defendant told Agent Keene that they were welcome to search his house and truck. Agent Keene then asked if they could look at Defendant's phone. Defendant replied that there was nothing on his phone and then willingly offered his phone's passcode. Agent Keene then read Defendant the Consent to Examine/Search of Telephone form and asked the Defendant to describe his phone. Defendant was able to describe the phone in detail, telling the agents the make, model, color, and year of the phone. Agent Keene again explained to Defendant what his rights were and that signing the form meant he was waiving those rights. Defendant then signed and printed his name on the Consent to Examine/Search of Telephone form. *See* Government's Exhibit No. 3.

Before the interview ended Agent Keene asked Defendant multiple questions regarding his personal information, such as his date of birth, social security number, phone number, email, and his wife's phone number. Defendant immediately rattled off all the requested information except for his wife's phone number, which he could not remember. Defendant then joked with Agent Keene and asked

him not to tell his wife that he could not remember her phone number. He also asked Agent Keene for a card and told the agents to call him if they had more questions.

In his hearing testimony Agent Keene explained his experience with interviewing potential defendants and how he conducts interviews. Agent Keene has been with the OSBI for 7 and a half years and has attended advance interrogation training and polygraph training. When asked how many of these interviews he has conducted, he said "hundreds, if not thousands." He explained that if someone does not seem like they understood the questions, he will terminate the interview immediately. But that was not the case with Defendant. Agent Keene testified that throughout the interview Defendant was alert and able to answer specific questions, such as his social security number, his phone number, birthdate, and hometown. Defendant never gave any indication that he did not understand the questions or the situation he was in. Special Agent Whitney's testimony further corroborated the fact that Defendant was aware of his rights and understood them. Agent Whitney testified that Defendant did not seem under the influence and seemed to have "all his faculties about him."

On April 20, 2021, a criminal Complaint was filed setting forth the factual allegations stated herein and concluding there was probable cause Defendant committed the offense of Murder in Indian Country in violation of 18 U.S.C. §§ 1111(a), 1151, and

6

1153. On May 13, 2021, the grand jury returned a two-count indictment against Defendant charging him with Murder in Indian Country in violation of 18 U.S.C. §§ 1111(a), 1151, and 1153 and Causing the Death of a Person in the Course of a Violation of 18 U.S.C. § 924(c) in violation of 18 U.S.C. § 924(j)(1). The grand jury also returned a Forfeiture Allegation pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).

**Voluntariness of Defendant's Confession**

Defendant challenges the admissibility of the statements he made to law enforcement officers on December 22, 2020, while the Defendant was at Oklahoma University's Medical Center. Defendant alleges that the Waiver of Rights and Consent to Examine/Search of Cellular Telephone forms were not signed voluntarily because of the pain medication he was on at the time. Therefore, he believes the forms and all statements attributed to the forms, should be suppressed.

For a *Miranda* waiver to be valid it must be given voluntarily, knowingly, and intelligently. *Miranda v. Arizona*, 382 U.S. 436, 444 (1966). This determination involves two separate inquires. First, the Court must determine if the waiver was voluntary in the sense that it was not the product of police coercion, intimidation, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the Court must determine if the waiver was made knowingly and intelligently, meaning that it was made with "full awareness of

both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

When evaluating if the waiver was made voluntarily, knowingly, and intelligently, a court must evaluate the totality of the circumstances. *Id.* Such factors considered include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment. *United States v. Lopez*, 437 F.3d 1059, 1063-64 (10th Cir. 2006) citing *United States v. Toles*, 297 F.3d 959, 965-66 (10th Cir. 2002). The Government bears the burden of showing, by a preponderance of the evidence, that the waiver was made without coercion and with the requisite level of comprehension. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004).

While the Defendant frequently claims that the waiver was not voluntary, he does not argue that he was coerced by the OSBI agents. Instead, his argument focuses on his claim that his statements were not made knowingly or intelligently because he was under the influence of prescription pain medication at the time of the interview. Therefore, this Court will also focus on the knowingly and intelligently prong of the inquiry.[3]

---

[3] The Court would note that even if Defendant did contend that he was coerced, the evidence shows that was not the case. He was not threatened in any way and no promises were made to him in exchange for him speaking. In fact, Agent Keene

8

Defendant claims that because he was under the influence of oxycodone, morphine, and methocarbamol, he was incapable of knowingly and intelligently waiving his rights. But being under the influence of pain medication is not enough to create a presumption that the Defendant did not knowingly or intelligently waive his rights. *United States v. Minard*, 208 F. App'x 657, 661 (10th Cir. 2006) (citing *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002)); see also *United States v. Augustine*, 742 F.3d. 1258, 1268 (10th Cir. 2014) (internal quotations and citations omitted).

Defendant called Dr. Jeffrey Bettinger ("Dr. Bettinger") to testify on his behalf on the impacts of pain medication on one's ability to voluntarily waive their *Miranda* rights. Dr Bettinger is a pharmacist who specializes in opioid narcotics and their effects on the human body. *See* Defendant's Exhibit No. 7. At the hearing, the Court recognized Dr. Bettinger as an expert witness. Based on his professional and medical experience Dr. Bettinger opined, to a reasonable degree of medical certainty, that the drugs administered to Defendant were likely still in Defendant's system at the time of the OSBI interview. Dr. Bettinger opined that the drugs Defendant was given would have impacted Defendant's executive level functioning, logical reasoning, and memory recall.

---

specifically told Defendant that he did not have the power to make such promises. *See* Government's Exhibit No. 2. While the agents did encourage Defendant to speak, it did not rise to the level of coercion.

He also opined that these drugs create an aurora of susceptibility, meaning that they increase the subjective value of a reward and reduce one's perception of risk. Dr. Bettinger opined that the pain medication Defendant had taken impacted his mental state to the point that his statements could not have been made voluntarily. But Dr. Bettinger admitted that the drugs Defendant took impacted every individual differently. He also admitted that he had no personal knowledge of Defendant's personal reaction to opioid drugs and had no knowledge of the interview, apart from the audio recording he listened to.

The Court is not persuaded by Dr. Bettinger's opinion that Defendant's waiver was not voluntary for a multitude of reasons. First, Dr. Bettinger admitted that the medication in question impacts every person differently. He admitted that he cannot say for sure how Defendant was affected, he can only speak to how he was possibly affected. Second, the studies he relied on were based on the impacts of these drugs on people who were addicted to opioids. *See* Defendant's Exhibit No. 8. But Dr. Bettinger admitted there is no indication that Defendant was addicted to opioids. The fact that each person is impacted differently by these drugs and that Dr. Bettinger does not have personal knowledge regarding how these drugs impacted Defendant causes this Court to be skeptical of his opinion on the voluntariness of Defendant's statements.

Under Defendant's proposed standard and according to the opinion of Dr. Bettinger, it seems one can never knowingly or intelligently waive their rights if they are under the influence of any pain medication. This is not true and multiple courts have stated as such. *Minard*, 208 F. App'x at 661 ("[Defendant's] mental state, pain medication level, and pain intensity level did not negate his ability to knowingly or intelligently waive his rights"); *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002) (holding that although the Defendant was in the hospital, recovering from wounds, and on pain medication, he still knowingly and intelligently waived his *Miranda* rights because he was "alert and responsive during the interview" and "demonstrated that he understood his right to remain silent"); *United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008) ("The mere fact of drug or alcohol use will not suffice [to show Defendant did not voluntarily waive his rights]. The defendant must produce evidence showing his condition was such that it rose to the level of substantial impairment"). While the pain medication should be considered, the Court still must look to the totality of the circumstances and as further discussed below, Defendant did knowingly and intelligently waive his rights despite being on pain medication.

The Court also addresses Defendant's heavy reliance on *Beecher v. Alabama*, 389 U.S. 35 (1967). Specifically, Defendant's assertion that *Beecher* held a confession cannot be voluntary if

one is "under the influence of drugs and at the complete mercy of the hospital authorities." *Id.* at 38. This statement mischaracterizes the case's holding and the facts surrounding it. In *Beecher*, the Court emphasized multiple facts that showed police coercion and that the waiver was not voluntary. First, the defendant in question had been held at gunpoint five days earlier and was threatened by a police officer. *Id*. at 36. Second, the medical assistant in charge told the defendant he had to corporate and asked the officers to let him know if the defendant "did not tell them what they wanted to know." *Id.* Third, the defendant in *Beecher* was "still in kind of a slumber" and signed written confessions that were prepared for him. *Id*. at 37. Finally, there also was no recording of the interview in *Beecher* to support the assertion that the defendant's waiver was voluntary.

The Court recognizes that the defendant in *Beecher* was clearly coerced and did not knowingly and intelligibly waive his rights. But the same cannot be said about the case at bar, as the facts are fundamentally different. Unlike in *Beecher*, there is no record of and Defendant does not claim that he was ever threatened in any way by hospital staff or officers. Further, the testimony and audio recording show that while Defendant was in pain, he was alert and able to answer questions. Defendant's reliance on *Beecher* ignores that this Court must look to the totality of the circumstances and

the circumstances in *Beecher* are vastly different from the ones at hand.

When examining the totality of the circumstances of this case and considering the factors set forth in *United States v. Lopez*, Defendant did knowingly and intelligently waive his rights. Nothing in the record indicates that Defendant's age, intelligence, or education prevented him from understanding his circumstances or the consequences of his actions. Defendant tries to argue that the pain medications prevented him from understanding his circumstances, but he still was able to answer the questions from OSBI agents and ask OSBI agents questions. He told them that he "knew his rights" and asked if what he was signing was an admission of guilt.

The second and third factors have no impact in this case, as Defendant had not even been arrested at this point. He was in the hospital and questioning had just begun.

The fourth factor weights in favor of the Government. Defendant was advised of his *Miranda* rights multiple times. Agent Keene read Defendant both waivers, and Defendant was given a chance to read the waiver himself. Defendant read the waivers and Agent Keene explained what the waivers meant. Further, Defendant signed both forms of his own accord. These waivers weigh heavily in favor of the fact that Defendant did know and understand the rights that

he was waiving. *United States v. Boyd*, 31 F. App'x 601, 603 (10th Cir. 2002) ("an express written statement of waiver, such as the "advice of rights" form signed by [Defendant], is strong proof of the waiver's validity" (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979))).

The fifth and final factor involves whether the Defendant was subjected to physical punishment. Defendant was not. While he was in pain, there is no indication in the record this was a punishment and as discussed above, there is no indication that his pain impacted his understanding of his rights.

When this Court examines the totality of the circumstances, it finds that Defendant validly waived his *Miranda* rights and that both the waiver, the consent to search his telephone, and the subsequent statements made were done voluntarily, knowingly, and intelligently.

## Conclusion

IT IS THEREFORE THE RECOMMENDATION OF THIS COURT that Defendant's Motion to Suppress Statements (Docket Entry #59) be DENIED. The statements which Defendant made to law enforcement are found to be entirely voluntary.

The parties are given fourteen (14) days from the date of the service of these Findings and Recommendation to file any objections. Failure to object to the Findings and Recommendation

within fourteen (14) days will preclude appellate review by the District Court.

IT IS SO ORDERED this 18th Day of November, 2022.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE